Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
10/21/2022 09:06 AM CDT

STATE OF NEBRASKA, APPELLEE, V.
KOMLA ABLIGO , APPELLANT.
___ N.W.2d ___

Filed July 29, 2022.    No. S-21-457.

1. **Rules of Evidence: Appeal and Error.** Where the Nebraska Evidence Rules commit the evidentiary question at issue to the discretion of the trial court, an appellate court reviews the admissibility of evidence for an abuse of discretion.

2. **Criminal Law: Motions for Continuance: Appeal and Error.** A decision whether to grant a continuance in a criminal case is within the discretion of the trial court and will not be disturbed on appeal absent an abuse of discretion.

3. **Sentences: Appeal and Error.** An appellate court will not disturb a sentence imposed within the statutory limits absent an abuse of discretion by the trial court.

4. **Judgments: Words and Phrases.** An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence.

5. **Sexual Assault: Evidence.** Nebraska's rape shield statute is not meant to prevent defendants from presenting relevant evidence, but to deprive them of the opportunity to harass and humiliate the complaining witness and divert the jury's attention to irrelevant matters.

6. **Evidence: Proof.** The bar for establishing evidentiary relevance is not a high one and requires only the probative value of the evidence to be something more than nothing.

7. **Evidence: Words and Phrases.** Unfair prejudice means an undue tendency to suggest a decision based on an improper basis.

8. **Rules of Evidence: Testimony: Proof.** Generally, the foundation for the admissibility of text messages has two components: (1) whether the text messages were accurately transcribed and (2) who actually sent the text messages. Testimony concerning context or familiarity with the manner of communication of the purported sender is sufficient foundation for

the identity of the sender and is typically in combination with testimony that the cell phone number belonged to or was regularly utilized by the alleged sender. The proponent of the text messages is not required to conclusively prove who authored the messages.

9. **Rules of Evidence: Hearsay: Appeal and Error.** Whether a statement was both taken and given in contemplation of medical diagnosis or treatment is a factual finding made by the trial court in determining the admissibility of the evidence, which an appellate court reviews for clear error.

10. **Sentences.** When imposing a sentence, a sentencing judge should consider the defendant's (1) age, (2) mentality, (3) education and experience, (4) social and cultural background, (5) past criminal record or record of law-abiding conduct, and (6) motivation for the offense, as well as (7) the nature of the offense and (8) the violence involved in the commission of the crime.

Appeal from the District Court for Douglas County: James M. Masteller, Judge. Affirmed.

Thomas C. Riley, Douglas County Public Defender, Korey T. Taylor, Tamara T. Mosby, and Hilary Burrows, Senior Certified Law Student, for appellant.

Douglas J. Peterson, Attorney General, and Austin N. Relph for appellee.

Heavican, C.J., Miller-Lerman, Cassel, Stacy, Funke, Papik, and Freudenberg, JJ.

Heavican, C.J.

On April 16, 2019, the State charged Komla Abligo by information with one count of first degree sexual assault, a Class II felony. The State alleged that Abligo sexually assaulted A.A. after a night of drinking alcohol and partying with Abligo's roommate, Robert Capers, and Angel Bils.

After multiple delays, a jury trial was held in the matter on March 8, 2021, after which the jury found Abligo guilty of first degree sexual assault. The district court sentenced Abligo to 4 to 10 years' imprisonment, with 87 days' credit for time served. Abligo appealed, and we moved this case to our docket. We affirm.

## I. FACTUAL BACKGROUND

On March 11, 2019, A.A. told her former foster mother, with whom she still had a relationship, that she had been sexually assaulted several days prior. Upon learning of the alleged assault, A.A.'s foster mother took her to a hospital for medical care, and law enforcement was notified. Officer Mark Magill was assigned to investigate the incident and was dispatched to the hospital.

At the hospital, nurse Carla Idrees performed a sexual assault nurse examination (SANE exam). A.A. explained to both Idrees and Magill the circumstances surrounding the assault, stating that it occurred on the morning of March 6, 2019, after she had spent the night drinking at Abligo's and Capers' apartment; a friend, Bils, was also present that night. While recounting the events, A.A. identified Abligo as her assailant. Later, A.A. provided to Magill screenshots of text messages from her phone, purportedly showing an exchange between herself and Abligo discussing the incident.

On March 16, 2019, Magill interviewed Abligo at the police station. After waiving his *Miranda* rights, Abligo admitted that he had sex with A.A., but claimed that he and A.A. were both still drunk that morning. Abligo also admitted that he had believed A.A. was Bils, with whom Abligo had a sexual relationship, and stated that he was not interested in A.A. in a sexual manner. Following this interview, Abligo was arrested. In April 2019, the State filed an information charging Abligo with one count of sexual assault in the first degree, a Class II felony.

A jury trial was originally scheduled for October 2019, but was continued to March 30, 2020, after the court granted Abligo's oral motion to continue. Abligo requested a second continuance, and the trial was continued to July 2020. A series of continuances then followed, many of which were related to the COVID-19 pandemic and the district court's inability to hold jury trials. Abligo's trial was eventually scheduled for March 8, 2021.

Prior to trial, the parties raised several evidentiary issues regarding the admissibility of certain video recordings, as well as the screenshots of text messages between A.A. and Abligo that had been provided to Magill. Abligo sought to admit three video recordings, each collected from the social media platform known as Snapchat, pursuant to Neb. Rev. Stat. § 27-412 (Reissue 2016). Each video was filmed by Abligo and depicted A.A. either posing for the camera or doing various activities while being recorded. Abligo sought to exclude the text messages on grounds of relevance, authentication, and hearsay.

At an evidentiary hearing, the State argued that the videos should be excluded, because Abligo failed to provide the requisite 15-day written notice of his intention to admit § 27-412 evidence, and that the videos were irrelevant, had no probative value, and would be unfairly prejudicial. Abligo responded that the videos were admissible under § 27-412 and relevant to the issue of A.A.'s consent and that if the videos did not depict sexual behavior within the scope of § 27-412, the videos were relevant to the issue of A.A.'s credibility. As for the text messages, Abligo argued that the State would be unable to authenticate the messages and lay the required foundation for their admission.

The district court ruled that the Snapchat videos were inadmissible, because Abligo had not established good cause for noncompliance with the statutory 15-day notice provision of § 27-412 and, alternatively, the videos did not depict sexual behavior; they had little, if any, relevance to the issues; and their probative value was outweighed by the danger of unfair prejudice, confusion, or misleading of the jury. The district court ruled that the admissibility of the text messages would be addressed at trial in the context of the evidence.

On Friday, March 5, 2021, Abligo moved to continue the trial, scheduled to start March 8. Abligo alleged that the State had just revealed Bils planned to testify regarding statements Abligo had made to her on the morning of the alleged assault

and that counsel needed additional time to consider the new information and prepare for trial. The State objected to a continuance, stating that Bils had been an endorsed witness since 2019 and that the State had repeatedly indicated that it intended to call Bils as a witness.

The district court declined to rule on Abligo's motion to continue and requested that a written motion and affidavit be submitted to the court. Abligo additionally moved the court to exclude Bils as a witness, citing the State's failure to disclose potentially exculpatory evidence to defense counsel in a timely manner. The State agreed to make Bils available for a deposition before the trial commenced, in lieu of excluding her as a witness. The parties conducted a deposition of Bils over the weekend, after which Abligo filed a written motion to continue with a supporting affidavit.

On the morning of trial, the court heard from both parties and overruled Abligo's motion to continue. The court reasoned that there was no prejudice to Abligo from the late disclosure of Bils' information because Bils would make a limited statement and because she was subjected to a deposition. The court then commenced a jury trial.

At trial, the State called A.A., Bils, Idrees, and Magill to testify. A.A. testified that on March 5, 2019, she and Bils had gone over to the apartment, which Abligo and Capers shared, to "hang out" as a group. At that time, A.A. was in a sexual relationship with Capers and Bils was in a sexual relationship with Abligo, but all four individuals were friends. A.A. had only met Capers and Abligo 6 months prior to March 2019, but had known Bils for approximately 2 years and had previously worked with Bils as a cocktail waitress.

A.A. said that the four had spent the night playing games and drinking. According to A.A., all four individuals were inebriated to some degree by the end of the night, but not "black-out drunk." A.A. said that she went to bed with Capers in his room at around 2:30 a.m. and that Bils went to bed with Abligo in his room sometime after that. A.A. said that

Capers had set his alarm for 5 a.m., the time he had to leave, and then they both "passed out." A.A. said that she went to bed naked.

The next thing that A.A. could remember was adjusting her sleeping position and seeing someone in bed next to her, who she assumed was Capers. The person started touching her, trying to initiate sex. A.A. was still partially asleep. Thinking the person touching her was Capers, A.A. put her hand up to stop him and said, "'No, I'm not in the mood,'" and "'No, baby, no.'" A.A. also said that she moved her body around to stop the person from touching her and that because the person kept touching her naked bottom, she rolled onto her back. The person then climbed on top of her and penetrated her. At that point, A.A. said her "brain [started] telling [her to] wake up, something [was] not right," but that she was not fully awake. A.A. felt the person with her hand, and it did not feel like Capers. She then fully awoke, finding that it was Abligo on top of her. A.A. says that she kicked him off, got out of the bed, and screamed at him. Abligo was naked and stood in the room for a bit before getting in the shower. A.A. testified that she never consented to having sex with Abligo.

At some point, Bils heard A.A. crying and came out of the other room to ask what was going on. A.A. told Bils what had happened, then retrieved her clothes and got dressed. A.A. called Capers and then called her brother to come pick her up. While waiting for her brother, A.A. spoke to Bils, and after some time, she went back into the apartment. Abligo tried to speak with A.A., but A.A. said that she began to yell at him. According to A.A., Abligo "kept saying [that] he wasn't in his right head" and that A.A. was "making it a bigger deal" than it was. A.A. thereafter left with her brother.

A.A. further testified that prior to the incident, she had Abligo's number saved in her phone. About 3 hours after the incident, Abligo texted A.A. and asked her to meet him for dinner and to talk about what happened. A.A. refused, and in the ensuing text conversation, A.A. accused Abligo of raping

her. Abligo responded with various apologies and explanations for his behavior.

Over Abligo's renewed objections, the screenshots of A.A.'s text messages were received into evidence. A.A. testified that these messages had been saved by taking a screenshot of her phone and that she had sent the screenshots to Magill in his investigation.

Bils was called to testify next, and her testimony was similar to A.A.'s. Bils testified that A.A.'s crying woke her up that morning and that she had heard A.A. yelling, "'I was asleep'" and "[t]hat's not me saying yes" from Capers' bedroom. Bils said she went into Capers' bedroom and found A.A. and Abligo, both naked. Abligo's penis was erect, and A.A. was hysterical. According to Bils, Abligo had said that "it wasn't like that" and that he was "trying to die the situation down," but that A.A. was "being dramatic" and "wanted to" have sex. Bils said that Abligo appeared nonchalant about the incident, and she also recalled that Abligo had flirted with A.A. the night before, but that A.A. did not flirt with Abligo.

Also testifying was Idrees, the nurse who had seen A.A. at the hospital and who had conducted a SANE exam for A.A. Idrees testified to her education, the typical process and procedures involved in a SANE exam, and the details of her SANE exam of A.A. Idrees stated that a vaginal or pelvic examination to obtain forensic evidence was not conducted due to the 5-day delay between the alleged assault and the date of A.A.'s SANE exam. Idrees' testimony included her recitation of statements made by A.A. during the SANE exam. Abligo objected to this portion of Idrees' testimony on hearsay grounds, and the district court overruled Abligo's objection after it concluded that such statements either were not hearsay or were a statement of the declarant's existing state of mind. Idrees further testified that as a SANE exam nurse, she works closely with law enforcement to collect information and forensic evidence that may be later used by police or prosecutors. Idrees stated that a SANE exam is meant to collect evidence

but does not prevent a victim from leaving out details, exaggerating the events, or misrepresenting information.

Finally, the State called Magill to testify regarding his investigation, including his interview of Abligo at the police station. During Magill's testimony, an audio recording of the interview was received into evidence and played for the jury. The audio recording revealed that during the interview, Abligo made various inculpatory statements, including an admission that he penetrated A.A. on March 6, 2019, and that he had texted her afterward to talk about what happened.

Abligo did not call any witnesses to testify on his behalf. On March 11, 2021, the jury returned a unanimous guilty verdict. The district court thereafter adjudged Abligo guilty of sexual assault in the first degree, a Class II felony. The district court ordered a presentence report to be conducted and prepared prior to sentencing.

At a sentencing hearing on May 10, 2021, the district court heard from the State, defense counsel, and Abligo himself. A.A. was present and read her victim impact statement, which was made part of the presentence report. The court then sentenced Abligo to 4 to 10 years' imprisonment, with 87 days' credit for time served.

Abligo appealed. We thereafter moved this case to our docket.

## II. ASSIGNMENTS OF ERROR

On appeal, Abligo assigns that the district court abused its discretion (1) by finding Snapchat videos of A.A. inadmissible; (2) by denying Abligo's motion to continue; (3) in admitting the text messages purportedly between Abligo and A.A. because the State failed to properly authenticate the messages, which included inadmissible hearsay; (4) by admitting Idrees' testimony and medical report, which were both inadmissible hearsay; and (5) by imposing an excessive sentence upon Abligo.

### III. STANDARD OF REVIEW

[1] Where the Nebraska Evidence Rules commit the evidentiary question at issue to the discretion of the trial court, an appellate court reviews the admissibility of evidence for an abuse of discretion.[1]

[2] A decision whether to grant a continuance in a criminal case is within the discretion of the trial court and will not be disturbed on appeal absent an abuse of discretion.[2]

[3,4] An appellate court will not disturb a sentence imposed within the statutory limits absent an abuse of discretion by the trial court.[3] An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence.[4]

### IV. ANALYSIS

#### 1. Snapchat Videos

In his first assignment of error, Abligo assigns that the district court abused its discretion by finding the Snapchat videos inadmissible. Abligo argues that the videos should have been admitted pursuant to Neb. Rev. Stat. §§ 27-401 and 27-403 (Reissue 2016), because they were each relevant to A.A.'s credibility, or pursuant to § 27-412, as specific instances of A.A.'s sexual behavior, for purposes of proving A.A.'s consent.

#### (a) Applicability of § 27-412

Abligo argues that the videos were admissible under § 27-412, otherwise known as Nebraska's rape shield statute, because they "depicted [A.A.] in a lingerie top . . . and dancing in front of Abligo in a sexual manner."[5] Abligo asserts the

---

[1] *State v. Wood*, 310 Neb. 391, 966 N.W.2d 825 (2021).

[2] *State v. Baxter*, 295 Neb. 496, 888 N.W.2d 726 (2017).

[3] *State v. Thieszen*, 300 Neb. 112, 912 N.W.2d 696 (2018).

[4] *State v. Hunt*, 299 Neb. 573, 909 N.W.2d 363 (2018).

[5] Brief for appellant at 21.

videos would help determine the issue of A.A.'s consent by showing A.A. had flirted with Abligo in the past.

[5] Under § 27-412, evidence offered to prove a victim's past sexual behavior or sexual predisposition is inadmissible unless an exception applies. One exception allows the admission of evidence of specific instances of sexual behavior of the victim to prove consent, if it is first established that such behavior is similar to the behavior involved in the case and tends to establish a pattern of behavior of the victim relevant to the issue of consent.[6] Nebraska's rape shield statute, § 27-412, is not meant to prevent defendants from presenting relevant evidence, but to deprive them of the opportunity to harass and humiliate the complaining witness and divert the jury's attention to irrelevant matters.[7]

The first video is approximately 9 seconds long and depicts A.A. wearing a pink tank top, white shorts, a silk robe, and sunglasses. A.A. briefly poses for the camera by looking over her shoulder while lowering the sunglasses, then asks, "Oh, you're recording me?" and twirls once to move off camera. The second video is approximately 5 seconds long and first depicts Capers' pouring a drink in his kitchen. The camera pans to the right, where A.A. is standing in jeans and a cardigan. Upon seeing the camera pointed at her, A.A. poses for a picture by turning her body slightly to the side while looking toward the camera. A.A. then releases her pose and laughs loudly. The third video is approximately 12 seconds long and depicts A.A. and Bils performing the splits. Both women laugh, and A.A. rolls from her position on the floor onto her knees, causing her to face away from the camera in the process, while Bils moves in the opposite direction and stands up on one leg before moving off camera.

Contrary to Abligo's assertions, these videos do not depict A.A. "dancing in front of Abligo in a sexual manner," nor do

---

[6] § 27-412(2)(a)(ii).

[7] *State v. Swindle*, 300 Neb. 734, 915 N.W.2d 795 (2018).

any of the videos depict A.A. dancing in "lingerie." Indeed, A.A. does not exhibit any sexual behavior in the videos: she is merely spending time with friends, laughing and playing games. Even if this type of behavior qualified as "sexual behavior" for purposes of § 27-412, it is unclear how such evidence would have constituted any pattern of behavior relevant to whether A.A. consented to sexual contact with Abligo on the morning of March 6, 2019. Under § 27-412, the videos would not be admissible.

Even if § 27-412 did apply, Abligo did not comply with the 15-day notice requirement set forth in subsection (3)(a). Nor did good cause exist to excuse Abligo's noncompliance, because even if the State did not timely provide witness contact information to Abligo, Abligo was the one who filmed the videos and hence knew what they would be used for in terms of proving or disproving his claims regarding the alleged assault.

### (b) Relevance and § 27-403

Conversely, Abligo argues that the videos, if they did not depict sexual behavior, were admissible under § 27-403. According to Abligo, the videos would attack A.A.'s credibility by proving that (1) A.A. was not "new" to drinking, (2) she was lying about her expressed comfort level around Abligo, and (3) A.A. had a flirtatious relationship with Abligo, indicating that she was interested in a sexual relationship with Abligo, which she now wanted to hide in order to protect her relationship with Capers.

[6,7] All relevant evidence is admissible except as otherwise provided by law, and evidence is relevant if it has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.[8] The bar for establishing evidentiary relevance is not a high one and requires only the probative value of the evidence to be something more

---

[8] See § 27-401 and Neb. Rev. Stat. § 27-402 (Reissue 2016).

than nothing.[9] Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.[10] Unfair prejudice means an undue tendency to suggest a decision based on an improper basis.[11]

At trial, and again in his briefs on appeal, Abligo asserts that A.A. consented to intercourse on March 6, 2019. However, in his interview with Magill at the police station on March 16, prior to being arrested, and also in his interview after conviction for purposes of a presentence investigation in May 2021, Abligo stated that he "was merely confused and ended up in the wrong bedroom with the wrong person." Essentially, Abligo stated that he and A.A. were both drunk from the night before and that when Abligo initiated sex and penetrated A.A., he believed that he was initiating sex with Bils, with whom he had an ongoing sexual relationship.

If we believe Abligo's story that he was merely confused about A.A.'s identity on the morning of March 6, 2019, then these videos are irrelevant as they would not prove or disprove any element or issue of the case, even if they did depict A.A.'s flirting with Abligo. If we assess the videos under the defense proffered at trial—/that A.A. consented to sex and thereafter changed her story for some other motive, such as to cover up an infidelity as we explain below—these videos either are irrelevant or would have little probative value, and the videos would be substantially outweighed by the danger of unfair prejudice or confusion of the issues.

In one of the videos, A.A. can be seen in the same room where alcohol was being served, which Abligo argues can prove that A.A. was not "new to drinking" around the time

---

[9] See *State v. Brown*, 302 Neb. 53, 921 N.W.2d 804 (2019).

[10] § 27-403.

[11] *State v. Munoz*, 303 Neb. 69, 927 N.W.2d 25 (2019); *State v. Brown, supra* note 9.

of the incident in March 2019, despite her testimony to the contrary. But the videos are undated, and Abligo presented no evidence that the videos were captured either well before or immediately prior to the incident, and thus, they cannot establish any timeline of A.A.'s drinking behaviors. Further, the videos cannot establish how much A.A. may or may not have been drinking, or whether such amount was typical consumption for A.A. or atypical. Thus, the videos would confuse the issues if used for this purpose and might lead to a trial within a trial on the topic of whether A.A. was indeed "new to drinking," even though the answer does not impact the underlying issue of A.A.'s consent.

As for Abligo's argument that the videos show A.A. had flirted with Abligo and now sought to cover up their flirtatious relationship to hide an infidelity and protect her relationship with Capers: Capers is on camera in one of the videos and would already be aware of any flirtatious relationship between A.A. and Abligo, having witnessed these actions firsthand. Thus, the videos did not prove any willingness of A.A. to lie to protect her relationship with Capers. And although A.A. may have mentioned in her deposition being uncomfortable around Abligo, she did not testify to this statement at trial. Hence, the videos were not relevant to any impeachment on these issues.

The district court did not err in finding these videos inadmissible. Even if the videos did depict sexual behavior per § 27-412, Abligo did not comply with the 15-day notice requirement and did not establish good cause for noncompliance. If the videos are instead assessed for their relevance, probative value, and prejudice, they are irrelevant to the underlying issue of consent and any probative value would be substantially outweighed by a danger of confusing the issues. This assignment of error is without merit.

## 2. Motion to Continue

In his second assignment of error, Abligo assigns that the district court abused its discretion by denying his motion to

continue, which was made on the Friday preceding a Monday trial. Abligo also asserts that the court erroneously determined that deposing Bils the weekend prior to trial cured the prejudice which arose from the State's late disclosure of Bils' contact information and late disclosure of statements Bils claimed that Abligo had made regarding the incident. Abligo also claimed that the State failed to disclose a working phone number for A.A.

Regarding contact information for A.A., the record indicates that Abligo inquired about a phone number to reach A.A. and that the State instead provided a working email address. The State clarified prior to trial that "[A.A.] is and has been very difficult to get ahold of. The only way we are able to communicate with her, due to phone issues, has been via email." Thus, the State provided Abligo with the same contact information that it used to contact A.A.

Regarding Bils, the State had a pretrial phone call on March 5, 2021, wherein Bils mentioned that on the morning of the incident after A.A. left the apartment, Abligo said something to the effect of, "[A.A.] wanted to have sex." Bils informed the State of a few additional statements that Bils attributed to Abligo, which may have supported Abligo's argument that A.A. consented to sex. The State immediately disclosed these statements to Abligo, and at a hearing held that same day, Abligo moved the court to continue trial based on this newly discovered evidence. Specifically, counsel for Abligo stated, "I believe that the state is calling . . . Bils for some information. I would just like for the state to give me contact information [and] for the Court to . . . make her available for deposition prior to her testimony."

As indicated by the State, Bils, A.A., or any of the listed witnesses could have been deposed any time by Abligo. And Abligo certainly knew of each witness and had plenty of time to request depositions: The information filed April 16, 2019, listed A.A., Bils, Idrees, and Magill as witnesses; these individuals were endorsed as witnesses since the date of the first

scheduled trial, originally set for October 2019; and the State also repeatedly indicated that it intended to call all four individuals at trial. Although the late timing of Bils' newly disclosed statements was "unfortunate" for all parties, as noted by the district court, the State provided the information to Abligo as soon as it learned of the information and made Bils available to be deposed on those statements prior to trial.

Based on this information, it was not an abuse of discretion for the district court to deny Abligo's motion to continue. This assignment of error is without merit.

### 3. TEXT MESSAGES

Next, Abligo assigns that the district court abused its discretion by admitting text messages purportedly between Abligo and A.A. regarding the incidents of March 6, 2019. Abligo argues that the State failed to provide foundation and did not properly authenticate the messages, which included inadmissible hearsay from A.A., and that the messages were unduly prejudicial.

[8] Generally, the foundation for the admissibility of text messages has two components: (1) whether the text messages were accurately transcribed and (2) who actually sent the text messages.[12] Testimony concerning context or familiarity with the manner of communication of the purported sender is sufficient foundation for the identity of the sender and is typically in combination with testimony that the cell phone number belonged to or was regularly utilized by the alleged sender.[13] The proponent of the text messages is not required to conclusively prove who authored the messages.[14]

There can be no issue regarding whether the text messages were transcribed erroneously or inaccurately, because the messages were presented through a screenshot, a static copy of

---

[12] *State v. Henry*, 292 Neb. 834, 875 N.W.2d 374 (2016).

[13] See *id.*

[14] *Id.*

the content visible on A.A.'s phone when she captured the images to share with Magill. As for the identity of the sender, A.A. testified that these images were from her phone, that the images showed text messages from herself to Abligo, and that Abligo was the other sender. A.A. testified that she and Abligo had previously texted from these numbers and in this same message thread. A.A.'s testimony concerning the context of the messages was that after the incident, Abligo texted her to ask if they could meet and talk about what happened, and he even offered that Bils could come along if A.A. wanted her there.

In addition to A.A.'s testimony, these same text messages were introduced by way of the interview between Magill and Abligo in March 2019, which was played for the jury after the recording was received into evidence. During the interview, Abligo informed Magill that he had texted A.A., and the two thereafter discussed Abligo's messages to A.A. Approximately 46 minutes into the interview, Magill asked Abligo if he talked to A.A. after the incident through text messages or a messaging service. Abligo replied in the affirmative and told Magill "it went, hey, I think we should get together and talk this out . . . . She wasn't about it, and I apologized." Magill then asked, "Did you tell [A.A.] you thought she was [Bils]?" Abligo said no, because he could tell A.A. "didn't want to hear it."

Abligo thereafter said he could not tell A.A. his side of the story because she would not let him talk, to which Magill replied, "well, it's text messaging, you can type anything you want to regardless of whether someone interjects or not." Abligo responded, "Well, you read that, it wouldn't have mattered. You read those messages."

Magill next read a few of the messages to Abligo, in which A.A. said "you got shit twisted, you understand what you did is considered rape right?" and asked, "at that point, why didn't you try to defend yourself?" Abligo's response was "because it wasn't supposed to be rape." Magill later asked Abligo, "Did you apologize to her for having sex with her when she didn't

want to?" to which Abligo responded, "I was going to do that in person."

Even if the text messages had not been authenticated by A.A. during her own testimony, this evidence would certainly be sufficient for authentication of the text messages. The text messages discussed match the information provided in the screenshots, and Abligo's statements to Magill show that he recognized the text messages, show that he was responding to A.A., and explain why his responses did or did not include certain information.

As for Abligo's argument that the text messages contained hearsay not within an exception, the text messages attributable to Abligo were his own statements offered against him, falling under the hearsay exception at Neb. Rev. Stat. § 27-801(4)(b)(i) (Reissue 2016) as statements of a party opponent. The statements within the text messages that were authored by A.A. were provided under a limiting instruction wherein the jury was told not to consider her text messages for the truth of the matter asserted, but instead to consider them "to assist . . . in understanding and assessing the texts of [Abligo]." Abligo also stated that the text messages were unfairly prejudicial, but does not explain why or give any supporting authority for this assertion.

Through A.A.'s testimony and the audio recording of Abligo's interview with Magill, the State provided sufficient foundation showing that the text messages were authored by A.A. and Abligo. The messages were statements of a party opponent or, alternatively, were not offered to prove the truth of the matter asserted, and thus, they were not inadmissible hearsay. The district court did not abuse its discretion in ruling that these messages were admissible. This assignment of error is without merit.

### 4. SANE Exam Testimony and Report

In his fourth assignment of error, Abligo argues that the district court abused its discretion in admitting testimony by

Idrees and in admitting the medical report from the SANE exam Idrees performed on A.A., because both consisted of inadmissible hearsay. According to Abligo, A.A.'s statements to Idrees were not made in legitimate and reasonable contemplation of a medical diagnosis or treatment because the SANE exam occurred 5 days after the incident. Additionally, Abligo points out that statements related to fault are usually inadmissible.[15]

[9] According to Neb. Rev. Stat. § 27-803(3) (Reissue 2016), "[s]tatements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment" are not excluded by the hearsay rule even though the declarant is available as a witness. Whether a statement was both taken and given in contemplation of medical diagnosis or treatment is a factual finding made by the trial court in determining the admissibility of the evidence, which an appellate court reviews for clear error.[16]

Here, the district court did not clearly err in determining that A.A.'s statements were admissible under § 27-803(3). A.A. made the statements while at the hospital, during a SANE exam to check for injuries and prescribe treatment related to an alleged sexual assault, and Idrees testified that she relied on A.A.'s statements to decide the extent of the examination and for treatment planning. For example, Idrees testified that the SANE exam occurred approximately 5 days after the alleged assault, so a physical examination would likely not succeed in the collection of DNA evidence; however, if A.A. had complained of any bleeding or pelvic pain, Idrees may still have ordered a pelvic examination.

But an analysis of whether these statements were necessary for medical diagnosis and treatment is ultimately unnecessary.

---

[15] See *State v. Vigil*, 283 Neb. 129, 810 N.W.2d 687 (2012).

[16] See *id.*

We have stated that the erroneous admission of evidence is harmless error and does not require reversal if the evidence is cumulative and other relevant evidence, properly admitted, supports the finding by the trier of fact.[17] Here, as admitted by Abligo, "the statements [Idrees] testified to at trial were essentially a recitation of [A.A.'s] own testimony."[18] As such, any error which resulted from the admission of such statements would be harmless. This assignment of error is without merit.

### 5. EXCESSIVE SENTENCE

Finally, Abligo assigns as error that the district court abused its discretion in imposing an excessive sentence upon him. Abligo argues that the district court did not properly consider mitigating factors when it imposed a sentence of 4 to 10 years' imprisonment and did not tailor the sentence to Abligo's individual circumstances.

[10] An imposed sentence that is within the statutory limits will not be disturbed by an appellate court unless the sentencing court committed an abuse of discretion.[19] An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence.[20] When imposing a sentence, a sentencing judge should consider the defendant's (1) age, (2) mentality, (3) education and experience, (4) social and cultural background, (5) past criminal record or record of law-abiding conduct, and (6) motivation for the offense, as well as (7) the nature of the offense and (8) the violence involved in the commission of the crime.[21]

The district court stated that in preparation for sentencing, it had reviewed the presentence report, the victim impact

---

[17] *State v. Figures*, 308 Neb. 801, 957 N.W.2d 161 (2021).

[18] Brief for appellant at 29.

[19] See *State v. Huff*, 282 Neb. 78, 802 N.W.2d 77 (2011).

[20] *State v. Hunt, supra* note 4.

[21] *State v. Dady*, 304 Neb. 649, 936 N.W.2d 486 (2019).

statement, and the sentencing memorandum prepared by Abligo. The court then noted that Abligo had no prior criminal record. The presentence investigation report revealed that Abligo scored in the moderate to low risk range for reoffense; he was in the low-risk level for sex offense issues; the probation office did not recommend probation; and Abligo continued to assert that he was mistaken as to A.A.'s identity on the morning of March 6, 2019, an indicator that Abligo had yet to take responsibility for his actions.

Accordingly, we find that the district court properly considered each mitigating factor and did not abuse its discretion in imposing a sentence of 4 to 10 years' imprisonment on Abligo. This assignment of error is without merit.

## V. CONCLUSION

The district court did not abuse its discretion in ruling that the videos were inadmissible, in denying Abligo's motion to continue, and in ruling that the text messages between A.A. and Abligo were admissible. Further, the district court did not clearly err in admitting Idrees' testimony and report. The district court also did not abuse its discretion when it sentenced Abligo to 4 to 10 years' imprisonment. Each of Abligo's assignments of error is without merit, and the decision of the district court is affirmed.

Affirmed.