IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

IN RE INTEREST OF ELI F. & MYA F.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF ELI F. AND MYA F., CHILDREN UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

JOSHUA F., APPELLANT.

Filed October 24, 2023.    No. A-23-297.

Appeal from the County Court for Otoe County: DAVID J. PARTSCH, Judge. Affirmed.

Jacob R. Meyer, of Polaris Law Group, L.L.C., for appellant.

Seth W. Hawkins, Deputy Otoe County Attorney, for appellee State of Nebraska.

Thomas Joseph Helget, of Knudsen, Berkheimer, Richardson & Endacott, L.L.P., and Anthony Bodell, Senior Certified Law Student, for appellee guardian ad litem.

PIRTLE, Chief Judge, and MOORE and ARTERBURN, Judges.

PIRTLE, Chief Judge.

## INTRODUCTION

Joshua F. appeals the order from the county court for Otoe County, sitting as a juvenile court, that terminated his parental rights to his children, Eli F. and Mya F. Joshua challenges the juvenile court's denial of his motion to continue and finding that it was in Eli and Mya's best interests to terminate his parental rights. For the reasons that follow, we affirm.

## BACKGROUND

Eli and Mya are twins born to Joshua and Shannon R. in April 2017. Prior to the children's birth, Joshua and Shannon lived together with Shannon's adult son, Colton R. Although their

- 1 -

relationship started off without incident, it became increasingly more violent after the children were born. Joshua began drinking daily and engaging in rougher behavior with Shannon, Eli, and Mya. He threw Eli and Mya in the air while he was intoxicated and backhanded Shannon several times. Additionally, as Shannon could not see through her left eye, Joshua would feign accidents whereupon he would make objects hit her in the face. During this period, Shannon was frightened of Joshua and afraid that he would hurt her if she left him.

Iowa Department of Human Services Case (Iowa DHS)

On September 22, 2018, Joshua took police officers on a high-speed chase in Iowa while Shannon, Eli, and Mya were in the vehicle. Joshua did not have a license and law enforcement found a meth pipe in the vehicle. Although he denied being intoxicated, Joshua admitted to smoking methamphetamine three weeks prior. A few days later on September 25, Joshua tested positive for methamphetamine.

Because the children were in the vehicle and there were concerns about Joshua using methamphetamine, the Iowa DHS got involved. On November 2, 2018, a Child in Need of Assistance case was opened against Joshua and Shannon. Throughout the pendency of the Iowa case, Joshua refused to engage with any of the offered services and failed to abide by court-ordered treatment plans. When he did participate, he was "hostile, aggressive, [and] threatening in his behaviors."

In January 2019, an Iowa district court found the children needed assistance and that returning them to Joshua's care was against their best interests. The court placed the children with Shannon under the supervision of the Iowa DHS. In its decision, the court cited to Joshua's "nonchalant attitude about treatment and proving sobriety" and his unsuccessful completion of court-ordered services. Pursuant to this order, Joshua was not allowed to share a home with the children. However, he was allowed visitation.

To reenter the home, Joshua had to provide Iowa DHS with information about his drug screens and complete a negative drug test. He complied with these requirements sometime around April 2019. Although the record is not clear when he moved back into the family home, he was reported to be living there in May.

Throughout the next several months, Joshua failed to comply with Iowa DHS recommendations that he partake in mental health and substance abuse treatment. These treatments were recommended after a report indicated that he "present[ed] with a diagnosis of Anti-Social Personality Disorder" and was "considered [a] borderline sociopath." Although he participated in some therapy, he was resistant to the treatment and made minimal progress.

Also, during this time there were high levels of animosity between him and Shannon. Joshua started missing work, leaving home for multiple days at a time, and not helping with the children. He lost his job in July 2019, and admitted to drinking alcohol to cope with stress. After that, he failed to provide a drug screen in accordance with Iowa DHS protocol. Eventually on September 6, due to his refusal to submit to drug screenings and to agree to the terms of a safety plan, the court ordered that Joshua not reside at the family home until he passed a drug test. On September 10, he passed a drug screen and was allowed to move back in.

On October 31, 2019, the children were removed from the home because of allegations that Joshua was using methamphetamine while caring for them. In its decision to remove the children

from the home, the court cited to Joshua's refusal to submit to a drug screen and Shannon "minimalizing the concerns of Joshua's drug use." On November 26, following Joshua testing positive for methamphetamine, the court found that continuing to allow him to care for the children was contrary to their interests. As such, the court prohibited them from living with Joshua. Notably, in this order, the court also ordered Joshua to stop being aggressive and threatening to Iowa DHS workers.

In February 2020, Shannon and the children moved to Nebraska City, Nebraska. Iowa DHS made one visit to the Nebraska City home which did not turn up any items belonging to Joshua. Following that visit, and against the guardian ad litem's (GAL) objections, the Iowa case was closed in March 2020.

SHANNON'S DEATH

On December 2, 2020, Joshua ran over Shannon with a car. It is believed that Eli and Mya were present when this occurred. Shannon was rushed to a hospital, but later succumbed to her injuries. Joshua then fled to Missouri, leaving Eli and Mya by themselves.

With Joshua on the run and Shannon in the hospital, law enforcement sought emergency temporary custody for the children. On December 3, 2020, the State filed a petition to adjudicate in the county court for Otoe County. That petition was granted on the same day. On December 11, a protective placement/custody hearing was held and the court ordered the children to have no contact with Joshua until further notice. Following Shannon's eventual death, the children were placed in the care of Joshua's brother, Jeremiah, and his partner, Angie.

At this time, Eli and Mya were two and a half years old. They were dealing with extensive trauma from the death of their mother, speech issues, separation anxiety, nightmares, and general sleep disturbance. Mya struggled with pronouncing letters correctly and Eli struggled with communicating with others. Eli was eventually diagnosed with speech apraxia which is a condition where the brain knows what it wants to say but it comes out incorrectly once it gets to the mouth.

After several months, the Nebraska Department of Health and Human Services (DHHS) became concerned with Jeremiah and Angie's suitability to care for the children. Specifically, DHHS was concerned with the children not being enrolled in school as well as Jeremiah and Angie's dishonesty and lack of communication. Additionally, there were reasons to believe that Jeremiah hit the children and used hot sauce as a means of discipline. Further, there were reports that one of Jeremiah's children bullied Eli by taking his clothes and forcing him to wear "little girls' pants." Based on these concerns, DHHS was unable to ensure that Eli and Mya were safe.

DHHS attempted to change Eli and Mya's placement in August 2021. In September, Eli and Mya were placed with Shannon's adult son, Colton, and his then-fiancé Amillia. When Jeremiah and Angie were made aware of the move, they refused to turn over the children or inform DHHS of their whereabouts. Eli and Mya were eventually located at a restaurant in Crete, Nebraska, and turned over to Colton and Amillia, who took the children to their home in Bedford, Iowa. Since living with Colton and Amillia, Eli and Mya have bonded well with them and are getting the medical, therapeutic, and educational services they require.

On June 7, 2021, Joshua was convicted of motor vehicle homicide for killing Shannon. On August 16, he was sentenced to 3 years in prison and 12 months' post-release supervision. Additionally, his license was revoked for 10 years.

While in prison, Joshua participated in several services provided to inmates. He underwent a mandatory psychological evaluation and participated in therapeutic visitation with Eli and Mya. Pursuant to the visitation, Eli and Mya visited him twice in prison. He also enrolled in a seven-week parenting course called "Destination Dads." Although he participated in these programs, his demeanor changed after the children were placed with Colton and Amillia. He became more hostile, negative, and hard to work with. He spoke over caseworkers, became combative, and generally was unreceptive to any help. Due to his increasingly belligerent behavior while in prison, his DHHS caseworker was uncomfortable meeting with him in person upon his release. She proceeded to remove herself from the case out of concerns for her own safety.

When discussing what he would do once released from prison, Joshua claimed to have a 1-million-dollar "financial nest egg." He planned to use this money to purchase an acreage in Iowa with an unidentified woman. Because his license was revoked, he asserted this woman would be responsible for transporting Eli and Mya to their various appointments. Despite articulating this plan, Joshua also informed caseworkers that he planned to live with Jeremiah and Angie after being released. He proceeded with this living arrangement even though he knew that reunification with his children would be impossible as long as he lived with them because their residence was already deemed to be unsafe for the children. Additionally, he did not seem to care about the difficulties in seeing his children as they resided in Bedford, Iowa, a considerable distance away from Jeremiah's residence in Crete, Nebraska.

Joshua was released from prison on June 2, 2022. His post-release case plan with DHHS involved him finding a permanent residence, getting an updated psychological evaluation, following that evaluation's recommendations, working with the children's therapist, assisting them in their therapeutic recovery, and abiding by his post-release supervision which included the completion of a domestic violence class. DHHS also wanted Joshua to participate regularly in all services being offered by DHHS. This included family support services, a parenting assessment, an in-person parenting class, and a co-occurring evaluation.

Despite these requirements and recommendations, Joshua regularly denied DHHS' services and refused to participate in them. He refused to do the court ordered psychological evaluation, the recommended parenting assessment, and participate in any therapy for himself or for the children. When DHHS offered the family support services that were required under his case plan, he refused the services outright because he did not believe he needed them. He also routinely failed to communicate with DHHS about his progress, expressed his belief that the services were unnecessary, and refused to comply with any recommendations made by any assessment. When asked about his progress with case goals, he was nonresponsive and became angry about being asked. While he participated in the required domestic violence class through probation, he never told DHHS if he completed the program or if he was still involved with it. Further, it was later discovered that his participation in the class was minimal and he expressed to the facilitators that he did not see anything wrong with using violence or intimidation with others.

Joshua also routinely refused to acknowledge the therapeutic needs for himself and his children. Despite being informed of the extensive trauma the children suffered because of their mother's death, Joshua did not believe the kids had trauma issues and refused to pursue therapy. He also displayed a lack of knowledge and interest in the children's developmental delays and speech issues. When asked how he would parent two kids with developmental delays, he denied they had delays and said he could handle it.

Following his release from prison, Joshua was allowed supervised visitation periods with Eli and Mya. These visits would involve Joshua meeting Eli, Mya, and a visit supervisor at a park or local library. Joshua brought food to these visits, pushed the children on swings, put on puppet shows, and generally just played with the children. During these visits, Eli and Mya were excited to see him and sad when they had to leave. While the visitation supervisors noted that Joshua and the children would have fun during these visits, they noted a lack of "parenting." Joshua would allow the kids to get out of his sight and did not pursue any sort of formal summertime programming or activities. Additionally, he did not work with the children on any academic or constructive behavior. Generally, the visits only consisted of Joshua "entertaining the kids with toys."

Despite his attempts to entertain the children, Joshua's impatience and aggression were a consistent theme throughout the visits. He would be "extremely short-tempered" with the children and threatening to the visitation workers. He expected the kids to "fall in line" and when they did not, he got impatient. One visitation worker noted that he continually needed to "check himself" because he was only able to handle a short amount of time with Eli and Mya before becoming aggressive. This was particularly concerning because Joshua was struggling with his temper even though he knew he was being watched. This behavior left little confidence that he would be able to maintain composure for extended unsupervised periods. His aggression was also prevalent over the phone. When the kids became distracted during phone calls, Joshua would get angry and yell at them. And when Eli and Mya were late to the phone visits, Joshua would scream at Amillia in front of them.

He would also get angry with the children when they discussed Shannon's death. When Mya talked about her mother, Joshua responded by telling her that she no longer existed. He was also adamant that the children were not present when he killed Shannon. He seemingly expressed this belief to the children as their description of the events changed over time. Mya originally was consistent in telling her therapist she was present and saw the incident, but after spending more time with Joshua she recanted. In one instance she even corrected Eli about how they did not see Shannon's death because they were not there when it happened.

It was also reported by Joshua's DHHS caseworker and a visitation supervisor that Joshua had a short temper regarding Eli's speech impediment and would mock him by mimicking it. Because he quickly grew impatient with Eli's speech problems, he displayed preferential treatment to Mya. This led to him spending most of his time and focus on her while ignoring Eli. On one visit where a supervisor was present, Eli wanted Joshua's attention so Eli hit him a few times. Joshua responded by yelling at Eli and shooting him with nerf darts despite Eli's repeated pleas to stop. During that same visit, Joshua told Eli—who was struggling to speak—to stop talking like a baby and to talk correctly if Eli wanted to talk to him. He also told Mya that they were going to move to Virginia but did not make similar comments to Eli.

Following the visits with Joshua, the children experienced more symptoms of their trauma. They would suffer from sleep disruptions and display maladaptive and aggressive behaviors. Additionally, during video calls with Joshua, the children became uncharacteristically violent. Eli and Mya would wrestle and hit each other which they did not do otherwise. Additionally, Eli's speech regressed after visits and he would stop trying to improve for a period afterward.

The visitation supervisors also consistently reported threatening behavior that made them uncomfortable and feel unsafe. They reported that Joshua was confrontational over the phone and often took pictures of their vehicles. During the visits, he would not make eye-contact with the supervisors and refused to listen to them. When the supervisors attempted to redirect his aggression, he refused to comply with their recommendations. As the case went on, his short temper got more prevalent and the workers did not want to go see him by themselves. Female supervisors were particularly intimidated by him and reported that they did not feel safe supervising his visits. As a result, the providers considered having two supervisors at every visit. Eventually it was requested that only male visitation workers supervise his visits.

There were also other concerning behaviors. There were peculiar situations where Mya would return wearing different underwear along with one occasion where Joshua kept the children's underwear after their visit. There was also a situation where Joshua attempted to evade the visit supervisor when taking Mya to the bathroom. On this occasion, when Mya told him she had to go to the bathroom, he insisted on taking her. The visitation supervisor attempted to redirect this behavior, but Joshua refused to listen.

Joshua's visitation was eventually suspended in January 2023, because the court found visitation was no longer in the children's best interests.

Following the suspension of his visitation rights in January 2023, Joshua did not have any in-person visitation with the children. During this period, neither child asked about him or expressed that they missed him. When Amillia asked Eli and Mya if they missed Joshua, Mya did not respond and Eli said, "No." Eli even asked Amillia if he had to have phone calls with Joshua and when a scheduled phone call did not occur, Eli responded "Hurray."

TERMINATION HEARING

On April 21, 2022, the GAL filed a motion to terminate Joshua's parental rights due to his continued refusals to comply with the case plan. However, due to the proceedings being continued several times, the hearing did not occur until February 2023. During this interval period, much of Joshua's previously described behavior took place.

In its filing, the GAL asserted Joshua failed to show he could put forth the necessary effort required for reunification, that he could provide for the children, and that he truly wanted to be reunited with them. Specifically, the GAL claimed five statutory grounds under Neb. Rev. Stat. § 43-292 (Reissue 2016) that supported termination of parental rights: (1) Pursuant to § 43-292(2), Joshua substantially and continuously or repeatedly neglected and refused to give the juveniles necessary parental care and protection; (2) Pursuant to § 43-292(3), Joshua willfully neglected to provide the juveniles with the necessary subsistence, education, or other care necessary for their health, morals, or welfare or neglected to pay for such subsistence, education, or other care when legal custody of the juveniles is lodged with others; (3) Pursuant to § 43-292(6), reasonable efforts to preserve and reunify the family have failed to correct the conditions leading to the

determination; (4) Pursuant to § 43-292(7), the juveniles have been in an out-of-home placement for 15 or more months of the most recent 22 months; and (5) Pursuant to § 43-292(9), Joshua subjected the juveniles to aggravated circumstances, including, but not limited to, abandonment, torture, chronic abuse, or sexual abuse. The GAL alleged the termination of Joshua's parental rights was in the children's best interests.

The termination hearing was held in February 2023, at which time the court noted the State of Nebraska had previously joined in the motion to terminate filed by the GAL. To simplify matters going forward in this opinion, we will simply refer to this joint prosecution team as "the State."

At the termination hearing, Joshua's attorney made an oral motion in limine to exclude the evidence from the Iowa DHS case, or alternatively be granted a continuance. He asserted that they did not receive any discovery for that evidence until a few days prior to the hearing and required time to review the material. The court denied the motions reasoning that Joshua had been aware of the Iowa case and had equal access to those documents as he was a party to the proceedings. Evidence was then adduced that laid out the above recited facts.

Following the hearing, the juvenile court terminated Joshua's parental rights. The court found the State proved all five statutory grounds for termination by clear and convincing evidence. It went on to find that Joshua was unfit to parent Eli and Mya and termination of his parental rights was in their best interests. The court was concerned about Joshua's increased hostility to caseworkers, his treatment of the children, and his denial that the children needed therapy. It found that because of their excessive trauma, Eli and Mya required "stability, safety, security, emotional regulation by their caregiver(s), and predictable expectations and consequences." Because Joshua's actions demonstrated a lack of the required mental and emotional fortitude to provide these things, the court found that termination of his parental rights was in Eli and Mya's best interests.

ASSIGNMENTS OF ERROR

Restated, Joshua assigns the juvenile court erred by denying his motion to continue the termination hearing and by ruling that it was in Eli and Mya's best interests to terminate his parental rights.

STANDARD OF REVIEW

A court's grant or denial of a continuance is within the discretion of the trial court, whose ruling will not be disturbed on appeal in the absence of an abuse of discretion. *In re Interest of Noah C.*, 306 Neb. 359, 945 N.W.2d 143 (2020).

An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the juvenile court's findings. *Benjamin S. v. Crystal S.*, 313 Neb. 799, 986 N.W.2d 492 (2023). When the evidence is in conflict, however, an appellate court may give weight to the fact that the juvenile court observed the witnesses and accepted one version of facts over another. *Id.*

## ANALYSIS

### MOTION TO CONTINUE

Joshua assigns that the juvenile court erred when it denied his request for a continuance at the termination hearing. Joshua contends the court's denial of his motion violated his right to due process because he was unfairly surprised by the records from the Iowa DHS case. Given this surprise, he claims his attorney should have been given additional time to review the records.

A court's grant or denial of a continuance is within the discretion of the trial court, whose ruling will not be disturbed on appeal in the absence of an abuse of discretion. *In re Interest of Noah C., supra*. An abuse of discretion occurs when a trial court's decision is based upon reasons or rulings that are untenable or unreasonable or if its action is clearly against conscience, reason, and evidence. *State v. Abligo*, 312 Neb. 74, 978 N.W.2d 42 (2022).

A review of the record demonstrates the juvenile court could have reasonably found Joshua and his attorney had knowledge of and access to the relevant evidence long before it was disclosed for the termination hearing. First, because Joshua participated in the original Iowa proceedings, it is reasonable to believe that he had personal knowledge that records from those proceedings existed. However, even if that was not the case, the record demonstrates that Joshua and his attorney were aware of the Iowa records more than a year before the termination hearing. At a January 27, 2022, review hearing, the county attorney's office requested a subpoena be served upon the Iowa DHS for those records. However, Joshua's counsel, who was the same counsel at his termination hearing, objected to that request and argued the records were not relevant to the proceeding. This clearly refutes the assertion that Joshua and his attorney were unaware that those records existed and lacked an opportunity to review them. As they were aware of the records for at least a year prior to their disclosure by the State, it cannot be said that they were unfairly surprised by the contents of the reports or the State's use of them. Therefore, we conclude the court did not abuse its discretion in denying Joshua's motion to continue. Accordingly, this assignment of error fails.

### TERMINATION OF PARENTAL RIGHTS

Joshua next generally claims that his parental rights should not have been terminated. He specifically assigns that the juvenile court erred when it found that termination of his rights was in Eli and Mya's best interests.

Termination of parental rights is a two-part inquiry. The juvenile court must first find by clear and convincing evidence that one of the statutory grounds under § 43-292 is met and second that termination is in the child's best interests. *In re Interest of Alec S.*, 294 Neb. 784, 884 N.W.2d 701 (2016). There are 11 bases for parental termination under § 43-292. Only one must be met to provide the statutory basis for termination. *In re Interest of Mateo L. et al.*, 309 Neb. 565, 961 N.W.2d 516 (2021). Once one of the bases is met, the appellate court does not need to consider the sufficiency of evidence concerning the State's other bases for termination. *Id*.

We first note that Joshua does not assign the juvenile court erred in finding the statutory grounds for termination were met under § 43-292(2), (3), (6), (7), and (9). He only assigns the juvenile court erred in finding that it was in the children's best interests for his parental rights to be terminated.

Although Joshua does not assign the juvenile court erred in finding that the statutory grounds for termination were met, for the sake of completeness, we conclude that the statutory ground under § 43-292(7) was met. The State provided clear and convincing evidence the children had been in an out-of-home placement for 15 or more months of the most recent 22 months as required by § 43-292(7). Eli and Mya were removed from the family home on December 2, 2020, and have remained in an out-of-home placement ever since. Therefore, at the time of the termination hearing, Eli and Mya had been in an out-of-home placement for approximately 26 continuous months. As one of the statutory grounds under § 43-292 is met, we do not need to consider the sufficiency of the evidence regarding the other bases for termination.

We now consider whether it was in Eli and Mya's best interest to terminate Joshua's parental rights. We conclude it was. A child's best interests are presumed to be served by having a relationship with his or her parent. *In re Interest of Leyton C. & Landyn C.*, 307 Neb. 529, 949 N.W.2d 773 (2020). This presumption is overcome only when the State has proved that the parent is unfit. *Id.* The best interests analysis and the parental fitness analysis are separate inquiries, but each examines essentially the same underlying facts as the other. *Id.* In the context of the constitutionally protected relationship between a parent and a child, parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which has caused, or probably will result in, detriment to a child's well-being. *Id.*

In determining whether a parent is unfit, the law does not require perfection of a parent; instead, courts should look for the parent's continued improvement in parenting skills and a beneficial relationship between parent and child. *Id.* As children cannot and should not be suspended in foster care or be made to await uncertain parental maturity, when a parent is unable or unwilling to rehabilitate themselves within a reasonable period of time, the child's best interests require termination of parental rights. See *In re Interest of Alec S.*, 294 Neb. 784, 884 N.W.2d 701 (2016). Last minute attempts by a parent to comply with the rehabilitative plan do not prevent the termination of parental rights. *Id.*

Joshua's questionable judgment, lack of mental stability, and his inability to regulate his emotions present a personal deficiency or incapacity which has prevented, and will probably continue to prevent, performance of a reasonable parental obligation in child rearing which has caused detriment to Eli and Mya's well-being. Joshua has shown that he is unable to control his temper whether it be with his children or other adults. More so, the consistency of Joshua's conduct and his refusal of offered services demonstrate an inability or unwillingness to rehabilitate himself.

Prior to Shannon's death, his communications with the Iowa DHS were marred by his hostility, aggression, and threatening behavior. While in prison, his caseworker noted that he was "hostile, negative and hard to work with." He spoke over her, refused to listen, and became combative when offered help. This led to his original caseworker feeling unsafe and removing herself from the case.

After his releasee from prison, this aggressive behavior continued with his attitude toward visitation workers and his children. Several visit supervisors expressed they felt unsafe due to Joshua's pattern of volatile, angry, and disruptive behavior. He did not listen to their recommendations, refused to make eye contact with them, took pictures of their vehicles, and proved to be generally confrontational. This behavior is not particularly surprising given his

expressed belief that there is nothing wrong with using violence or intimidation with others. Further, even when being monitored by the supervisors, Joshua struggled to control his temper around his children. He was particularly impatient with Eli's speech and would raise his voice and yell at him. As his temper has been a consistent theme throughout the pendency of his case, we have little confidence that this behavior will change.

Also indicative of his inability and unwillingness to rehabilitate himself is his failure to comply with his case plan. Since his release from prison, he has consistently failed to comply with the requirements of his case plan and routinely denies the need for DHHS services. The services he denied include family support services, therapy, parenting classes, and a psychological evaluation. He denied these services even though his case plan required their completion to reunify with his children. Additionally, he has proven completely disinterested in communicating his progress with DHHS. Although he testified at the termination hearing that he enrolled in a parenting class and booked an appointment for a psychological evaluation, he provided no proof of those matters to DHHS. Assuming he made those appointments, it seems he only did so after it became apparent that his parental rights were in jeopardy.

Also illustrative of his inability to follow his case plan is his attempt to evade the visitation supervisor by taking Mya to the restroom. Although it was made clear to him that they could not leave the supervisor's sightline, Joshua took Mya to the bathroom behind closed doors. Upon being redirected to stop the behavior, he insisted on accompanying Mya out of the supervisor's sight.

Joshua also demonstrates an inability to care for two children with developmental delays. He denies that they were present when he killed Shannon, that they experienced trauma from that experience, and that they suffer from developmental delays. Due to his refusal to acknowledge these things, he does not believe the children need therapy. He also proves unknowledgeable and unsympathetic to their speech impediments. He mocks Eli's speech impediment and is short tempered when he has difficulty speaking. This leads to him ignoring Eli in favor of Mya. More so, Eli and Mya's visitations with Joshua correlate to a worsening of their symptoms. After seeing Joshua, both children become more aggressive and Eli's speech regresses.

Joshua's actions also display a general lack of interest in his children and their safety. While in prison, he never asked about his children during family team meetings. Since his release, he has never contacted Colton or Amillia about the status of his children. He has also never accompanied them to their appointments, been to their therapist's office, or attended their extracurricular activities. Additionally, despite being informed that reunification was impossible as long as he resided with Jeremiah and Angie in Crete, Joshua still chose to live there after he was released from prison. He appeared to be unconcerned about the allegations that Jeremiah hit his children and used hot sauce as punishment. Nor did he seem to appreciate the time it took to travel the distance from Crete to Bedford, Iowa, where the children resided.

Likewise, it appears that Eli and Mya are disinterested in him. Joshua had no contact with Eli and Mya for approximately a month and a half leading up to the termination hearing. During that time, Mya did not express that she missed him and Eli stated that he did not. Further illustrative of the children's attitude was Eli's joyful expression when he did not have to talk to Joshua on the phone.

Given Joshua's history of aggressive behavior and refusal to make positive changes in his life, we find clear and convincing evidence that Joshua's personal deficiencies have prevented and

will prevent him from performing reasonable parental obligations to Eli and Mya. In addition, given his history of noncompliance with his case plan, aggression toward caseworkers, and his continued denial that he needs services, we find no reason to believe that he will be open to rehabilitation going forward. As such, we find the termination of Joshua's parental rights was in the best interests of his children. Accordingly, we affirm the juvenile court's termination of his parental rights.

## CONCLUSION

For the foregoing reasons, we affirm the juvenile court's denial of Joshua's motion to continue and its termination of Joshua's parental rights.

AFFIRMED.